# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

_____

## UNITED STATES

**v.**

## Airman First Class JARRID R. GABLE
## United States Air Force

## ACM 38612

## 5 November 2015

Sentence adjudged 1 February 2014 by GCM convened at Minot Air Force Base, North Dakota. Military Judge: Shaun S. Speranza.

Approved Sentence: Bad-conduct discharge, confinement for 6 months, and reduction to E-1.

Appellate Counsel for Appellant: Captain Lauren A. Shure.

Appellate Counsel for the United States: Major Meredith L. Steer and Gerald R. Bruce, Esquire.

Before

ALLRED, TELLER and ZIMMERMAN
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

ZIMMERMAN, Judge:

At a general court-martial composed of officer and enlisted members, Appellant was convicted, contrary to his pleas, of sexual assault, attempted sexual assault, and abusive sexual contact, in violation of Articles 80 and 120, UCMJ, 10 U.S.C. §§ 880, 920. The court sentenced Appellant to a bad-conduct discharge, confinement for 6 months, hard labor without confinement for 3 months, and reduction to E-1. The convening authority did not approve the hard labor without confinement and approved the remainder of the sentence as adjudged.

On appeal, Appellant contends the Government failed to offer sufficient evidence to corroborate the essential facts of Appellant's confession. He also argues that if we conclude Appellant waived this issue, we should find his trial defense counsel provided ineffective assistance of counsel. Lastly, Appellant asks this court to find the evidence legally and factually insufficient to prove the offense of sexual assault, because the Government failed to show Appellant knew or reasonably should have known A1C AL was impaired in such a manner as to be incapable of consenting to the sexual act.[1] We disagree with all three contentions and affirm the findings and sentence.

*Background*

Appellant was convicted of three offenses: sexual assault of A1C AL when she was incapable of consenting to the sexual act due to impairment by alcohol; abusive sexual contact upon Ms. DM[2] by touching her genitalia through her clothing; and attempted sexual assault of Ms. DM. The crimes against Ms. DM arose from the same incident and were merged by the trial judge for sentencing purposes.

To prove sexual assault of A1C AL, the Government presented testimony from A1C AL, Ms. DM, Ms. NZ (who testified about a prior sex offense by Appellant), a forensic biologist from the U.S. Army Criminal Investigation Laboratory, the Air Force Office of Special Investigations (AFOSI) case agent, and seven friends and coworkers.

On the night of 21 December 2012, A1C AL went out to celebrate a friend's birthday. They went to a local bar, where she met up with another group of friends she knew from work and stayed at the bar until closing. A1C AL testified she had consumed a shot of vodka, three Vegas bombs, five Patron shots, and four Red Bull and vodkas throughout the evening before arriving at Appellant's house. After departing the bar, the group went to Appellant's house which he shared with A1C AL's coworker, and A1C AL remained at the house until the next morning. She had met Appellant only one time prior to that night and had no significant interaction with him on that prior occasion.

A1C AL testified her level of intoxication was one of the drunkest she had ever been, and testified about her inability to recall events from her time at the bar and at Appellant's house. When retelling events from that night, she could not recall any sexual activity and woke up on the couch sensing nothing out of the ordinary. The others gathered at Appellant's house were a mix of friends and coworkers of both Appellant and A1C AL. Witnesses testified to their own levels of intoxication while at Appellant's house, ranging from no alcohol use to passing out due to drunkenness shortly after

---

[1] Appellate defense counsel added a footnote to this last assignment of error, stating they had not seen the sealed material and requested opportunity to supplement this issue or pleadings entirely after review of sealed material. Appellate defense counsel did not file supplemental pleadings after viewing sealed portions of the record of trial.

[2] The witness we refer to as Ms. DM has been identified by various initials in post-trial documents and in appellate counsel's pleadings. She has been referred to as DMM, DM, and DW, but is one and the same person.

arrival.  Despite the wide-ranging intoxication levels, most of the witnesses testified they could observe A1C AL was intoxicated.  More than one witness recounted that A1C AL was obviously drunk.  They could tell from her body movements, the slurring of her words, how she was acting, the look of her eyes, her unawareness of her surroundings or other people near her, and how she went to the couch in the living room and passed out while the rest of the attendees continued to drink and socialize.  These witnesses also testified Appellant was at the house with the group while A1C AL was there.

After the night at Appellant's house, A1C AL saw Appellant several days later at an on-base bar on New Year's Eve.  It was on this occasion that Appellant first spoke to A1C AL about having sexual intercourse with her at his house.  During the conversation, she asked him his first name, to which he replied, "You don't remember what happened last time you were at the house?"  When she responded "no," Appellant stated they had "hooked up."  She then asked Appellant, "all the way?" to which Appellant replied "yes."  Trial defense counsel did not object to this testimony.  This conversation took place prior to the investigation.  Additionally, testimony from Appellant's friends indicate he told two of them what happened with A1C AL, telling one friend he had sex with A1C AL that night at his house.  Testimony from the friends was elicited by trial defense counsel on cross-examination.

During her testimony at trial, A1C AL identified a prosecution exhibit containing the full text message of a conversation she had with Appellant on 1 February 2012, which occurred during the criminal investigation by AFOSI.  After trial counsel offered the document into evidence as a fair and accurate representation of the text message conversation, the military judge asked trial defense counsel if he had any objection.  Trial defense counsel raised none, and the military judge admitted the document into evidence.

A1C AL initiated the text message exchange with Appellant by writing:  "Im buggin out.. its been bugging me and I want to ask.. you said we hooked up..what all went down? Plz don't be all confrontational I just wanna know because I don't even know if you had a condom on."

After a bit of back and forth regarding the status of his investigation and whether he ought to be communicating with her, Appellant gave more detail on the interactions leading up to sexual intercourse.  The following statements by Appellant are excerpts from the full exchange contained in the admitted exhibit:

> Don't worry I practiced safe sex for both of us . . .
>
> I used a condom. And I'm clean so don't worry about that . . .
>
> If you weren't into it.  It wouldn't have happened.  I turned to go back upstairs and you pulled my arm towards you and started kissing me and it took off from there . . .

I told you to go sleep in my room because you were hanging off the couch. I was about to lay down and you began walking into the bathroom area which isn't my room so I walked you downstairs to my room and you sat on the bed and I started walking away and you grabbed my arm and started kissing me and putting your arms around me and it progressed from there . . .

Don't be sorry and don't be embarrassed. We were both really drunk . . . .

In addition to the testimony of the two victims in the charged offenses, the Government also presented testimony from Ms. NZ, who considered Appellant one of her best friends and one of her only friends at the time. Ms. NZ testified she was invited by Appellant to come over and drink one night in late October or early November 2012. She accepted the invitation, and they spent time together at Appellant's house, but she did not drink that night. When she decided she wanted to go to sleep, she went to a couch in the living room and fell asleep on the couch. Appellant went to his room downstairs. She awoke to him shaking her and asking if she wanted to move to his roommate's bed which was also downstairs. Shortly after she lay down on the roommate's bed, Appellant entered the room and tried to get in bed with her. She told him she didn't want to sleep in the bed with him and went back to the couch. She fell asleep again on the couch, and later awoke to Appellant pulling her pants down to her knees, and she pushed him off.

The AFOSI case agent and the forensic biologist testified about physical evidence found in Appellant's room. The case agent testified that he searched Appellant's house and seized evidence, including a fitted bed sheet. The forensic biologist testified about her analysis of the bed sheet, including her findings that the DNA present in a semen stain on the bed sheet matched both the Appellant's and A1C AL's DNA profiles. The DNA report was admitted. The biologist conceded that the presence of both sets of DNA on the sheet did not necessarily indicate that they were deposited at the same time.

*Corroboration of Admissions*[3]

On appeal, Appellant asserts there was no independent evidence to corroborate his statements that he and A1C AL had sexual intercourse. Appellate defense counsel addresses the DNA evidence presented by the Government to prove sexual intercourse,

---

[3] Appellate defense counsel presented the first issue as a lack of sufficient corroboration of Appellant's confession; however, the record did not contain a confession or acknowledgement of guilt by Appellant. He told witnesses he had sexual intercourse with A1C AL but did not acknowledge guilt. In this opinion, we will refer to the statements made by Appellant as admissions. "Admission" is defined in Mil. R. Evid. 304(a)(1)(C) as a "self-incriminating statement falling short of an acknowledgment of guilt, even if it was intended by its maker to be exculpatory."

and argues the evidence actually contradicted Appellant's statement that he used a condom because it is unlikely that semen would have gotten on his bed sheet as a result of this sexual encounter. Further, appellate defense counsel contends the Government offered no evidence to corroborate Appellant's motive, intent, involvement with A1C AL, or opportunity. We disagree with the contention that there was no independent evidence to corroborate the essential facts in Appellant's admissions.

Appellant's trial occurred prior to our superior court's decision in *United States v. Adams*, where the court clarified that the corroboration requirement applied independently to each essential fact in a confession or admission that the Government wishes to admit. 74 M.J. 137 (C.A.A.F. 2015). Only those corroborated facts are admissible, and the remaining uncorroborated facts must be excised. *Id.* at 140. Given this development in the law on corroborating confessions, Appellant forfeited, rather than waived, the error by failing to object at trial. *United States v. Humphries*, 71 M.J. 209, 211 (C.A.A.F. 2012) ("Because the law at the time of trial was settled and clearly contrary, it is enough that the error is plain now, and the error was forfeited rather than waived.").

If an appellant forfeited an objection by failing to raise it at trial, we review for plain error. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). Under a plain error analysis, a military appellate court "will grant relief in a case of non-constitutional error only if an appellant can demonstrate that (1) there was error; (2) the error was plain and obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Clifton*, 71 M.J. 489, 491 (C.A.A.F. 2013). The plain error doctrine "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Fisher*, 21 M.J. 327, 328–29 (C.M.A. 1986) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)) (internal quotation marks omitted).

Admitting into evidence a confession or admission by an accused without corroboration of all essential facts would be plain error. In this case, the essential facts in Appellant's admissions were sufficiently corroborated by independent evidence; therefore, the military judge did not commit plain error when he admitted Appellant's admissions.

Military Rule of Evidence 304(c)(1)–(2) reads in pertinent part:

> An admission or a confession of the accused may be considered as evidence against the accused . . . only if independent evidence . . . has been admitted into evidence that corroborates the essential facts admitted to justify sufficiently an inference of their truth. . . . If the independent evidence raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission

> may be considered as evidence against the accused only with respect to those essential facts stated in the confession or admission that are corroborated by the independent evidence.

The rule requires independent evidence sufficient to justify an inference of the truth of the essential facts admitted from the confession.[4] While our superior court had "previously noted that a sufficient amount of evidence can be slight, the evidence must nevertheless be sufficient in quantity and quality to meet the plain language of the rule." *Adams*, 74 M.J. at 140. What constitutes an essential fact of an admission or confession varies by case, and in previous case law has included "time, place, persons involved, access, opportunity, method, and motive of the crime." *Id.*

Appellant made three pretrial statements regarding sexual intercourse with A1C AL, the text messages containing the most detailed description of the incident. Besides the sexual act itself, essential facts from Appellant's admissions included the site of the sexual act, A1C AL's level of impairment and his characterization of her condition, and his opportunity and access to A1C AL. We have analyzed whether there was sufficient corroboration for each essential fact drawn from Appellant's verbal and text message admissions and find they were sufficiently corroborated.

<u>Sexual Act</u>: Independent evidence consisting of the AFOSI case agent's testimony, testimony from the Army laboratory's forensic biologist, and the bed sheet stained with semen containing a mixture of Appellant's and A1C AL's DNA sufficiently corroborated Appellant's admission of sexual intercourse. Although not conclusive, this evidence is sufficient to justify an inference of truth of that essential fact in his admission. The case agent testified he searched Appellant's house on 3 January 2013, seized a bed sheet from Appellant's bedroom, and sent the sheet to be analyzed by the Army crime lab. The forensic biologist testified she discovered and conducted DNA testing of a semen specimen located in one area of the sheet, compared it to known DNA standards from Appellant and A1C AL, and found a mixture in the specimen consistent with the DNA profiles of Appellant and A1C AL.

Appellant argues that other explanations for the presence of the DNA on his sheet render the expert testimony insufficient to corroborate the essential fact that the two engaged in intercourse. He points out that the expert conceded that A1C AL's DNA could have been transferred to the sheet simply by her lying on the bed. He adds that the evidence he used a condom further undermines any inference that semen found on the sheet was related to sexual contact with A1C AL. We find that argument unpersuasive. First, A1C AL testified that she had never been in Appellant's bedroom before or after the alleged incident, so the opportunity for innocent transfer of DNA to Appellant's fitted

---

[4] Mil. R. Evid. 304(c)(4) reads: "The independent evidence necessary to establish corroboration need not be sufficient of itself to establish beyond a reasonable doubt the truth of facts stated in the admission or confession. The independent evidence need raise only an inference of the truth of the essential facts admitted."

sheet was limited. Second, the DNA was found specifically in a location the expert identified as a semen stain. Finally, Appellant's suggestion that condom use would have prevented the transfer of semen, and presumably any commingled DNA from A1C AL, relies on its own set of inferences related to both the extent of such condom use and Appellant's own post-intercourse conduct. The evidence needed to corroborate an admission need not foreclose all other reasonable possibilities. The independent evidence "need not [establish reliability] beyond a reasonable doubt or by a preponderance of the evidence." *United States v. Cottrill*, 45 M.J. 485, 489 (C.A.A.F. 1997). We do not read *Adams* to change the well-established rule that a sufficient amount of evidence can be slight, but rather to reinforce the notion that the evidence must raise an inference of the truthfulness of each essential fact at issue. We find, despite potential other explanations, that the presence of a semen stain on Appellant's bed sheet containing commingled DNA from Appellant and A1C AL is sufficient to justify an inference of truth as to Appellant's admission that he and A1C AL engaged in sexual intercourse in his bed.

Place: The evidence described above similarly serves as independent corroboration of Appellant's admission that he guided A1C AL from the couch to his bedroom. According to the agent, the sheet was seized from Appellant's bed less than two weeks after the sexual act occurred. The presence of A1C AL's DNA on the bed sheet in his room corroborated Appellant's statement that he took her to his room on 22 December 2012.

A1C AL's Impairment and Appellant's Knowledge: There is sufficient independent evidence to corroborate Appellant's text message admissions describing A1C AL's state of intoxication. The essential facts include both his description of A1C AL as "really drunk" as well as his description of her behaviors that support an inference that she was incapable of consent and that he either knew or reasonably should have known of that condition. Via text message, Appellant described how A1C AL was hanging off the couch, and he had to assist her to his bedroom when she began to walk into the bathroom area instead. Multiple witnesses testified about A1C AL's intoxication from alcohol in the late hours of 21 December into the early hours of 22 December 2012. First, A1C AL testified she was drunk. Throughout the course of the night, she had drunk a shot of vodka, three Vegas bombs, five Patron shots, and four Red Bull vodkas. She caught herself stumbling a couple of times, and even vomited in a trashcan after her last shot of alcohol at the bar. She described her condition that night as one of her "drunker nights" and could not recall certain events that night, having only "snapshots" of memories at the bar and Appellant's house. Second, witnesses described A1C AL as obviously drunk at Appellant's house. They testified they could tell she was drunk from her body movements, the way she acted, and the appearance of her eyes. They also recounted how A1C AL went to a couch in the living room to sleep or pass out while the party continued around her. Their collective testimony depicts A1C AL as highly intoxicated while at Appellant's house.

Access and Opportunity: Independent evidence also corroborated Appellant's access to A1C AL while she was impaired by alcohol and his opportunity to take her from the living room couch to his bedroom. Appellant's text message explained the condition in which A1C AL slept on the couch as the reason for telling her to go sleep in his bedroom. Several witnesses confirmed A1C AL passed out on the couch in the living room in plain view and remained there while the rest of the group continued to drink and socialize. She only awakened momentarily when her friends threw ping pong balls at her, then fell into a drunken sleep again, remaining on the couch when witnesses went to bed or left the house. Testimony regarding A1C AL's intoxication and her drunken sleep in an open area corroborated Appellant's admitted access, opportunity, and his ability to observe her hanging off the couch.

Furthermore, the Government presented photographs and testimony regarding Appellant's bedroom, located downstairs from the living room and sole bathroom on the main floor. This evidence is consistent with, and corroborates, Appellant's text message describing the bathroom area as not being in the same area of the house as his bedroom. It also corroborates his admission that he walked her downstairs to his room, which was the location of the sexual act.

Similarity to Past Sexual Offense: Last, we considered Ms. NZ's testimony about an uncharged sexual offense for its corroborative value. While not alike in all respects, Appellant's actions from the separate uncharged offense were sufficiently similar to Appellant's admissions about how he approached A1C AL while she was asleep on the couch. The evidence need only raise an inference of the truthfulness of the facts admitted. The two incidents were close in time, occurring less than two months apart. Of their own volition, both women in these separate instances went to a couch in Appellant's living room and fell asleep. Neither of them had a prior sexual relationship with Appellant, nor did they ever indicate to Appellant that they were interested in one. Nonetheless, in both instances he spontaneously woke them up from their apparent slumber to suggest they go downstairs to sleep in a bedroom. He had access to both of the victims in these separate instances when they were at his house, sleeping in an open area. He also had opportunity to get them to move to an ostensibly more comfortable sleeping arrangement by suggesting they go to sleep in a bed downstairs, instead of sleeping on the couch. The striking similarities from the prior uncharged offense provided independent evidence to corroborate Appellant's statements as to how A1C AL ended up in his bedroom.

*Ineffective Assistance of Counsel*

Appellant contends if we find the corroboration issue was waived, his trial defense counsel were ineffective for failing to seek suppression of Appellant's admissions. Finding Appellant's pretrial admissions were sufficiently corroborated and properly admitted, we likewise find Appellant has not met the high burden set forth by the Supreme Court in this claim of ineffective assistance of counsel.

In order for counsel's ineffective performance to be a Sixth Amendment[5] violation, Appellant must show that his trial defense counsel were deficient and the deficiency prejudiced his defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Counsel is deficient when his representation falls "below an objective standard of reasonableness." *Id.* (citing *Stickland*, 466 U.S. at 688). Then to establish prejudice, Appellant must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 534 (quoting *Stickland*, 466 U.S. at 694) (internal quotation marks omitted).

With regard to allegations of ineffective assistance of counsel, "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Consistent with this principle, our superior court has stated that, "[w]hen a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Jameson*, 65 M.J. 160, 163–64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001)). We review such claims de novo.

Trial defense counsel did not object to the admissibility of Appellant's pretrial statements, which was reasonable in light of the Government's corroborating evidence and the then-existing law on corroboration of confessions and admissions. The lack of an objection did not fall "measurably below the performance standards ordinarily expected of fallible lawyers." *United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005). We note that even under the current *Adams* standard on corroboration, Appellant's admissions to A1C AL would have been admissible for reasons stated above. Thus, there was not a reasonable probability that a motion to suppress or objection would have succeeded, making reasonable the trial defense counsel's decision to not object to the admissibility of Appellant's statements.

*Legal and Factual Sufficiency of Specification 1 of the Charge*

Lastly, Appellant argues the evidence is legally and factually insufficient for Specification 1 of the Charge (sexual assault of A1C AL), because the Government failed to prove Appellant knew or reasonably should have known A1C AL was impaired in such a manner as to be incapable of consenting to the sexual act. We disagree.

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F.

---

[5] U.S. CONST. amend. VI.

2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the [appellant's] guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. Our appellate review "involves a fresh, impartial look at the evidence," contained in the "entire record without regard to the findings reached by the trial court" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

We find the evidence legally and factually sufficient to support Appellant's conviction of sexual assault of A1C AL by penetrating her vulva with his penis when she was incapable of consenting due to impairment. The elements of that offense are: (1) that the accused committed a sexual act upon a certain person, and (2) that the accused did so when the alleged victim was incapable of consenting to the sexual act due to impairment by a drug, intoxicant or other similar substance, and that condition was known or reasonably should have been known to the accused. *Manual for Courts-Martial, United States*, pt. IV, ¶ 45.a.(b)(3) (2012 ed.).

Evaluating the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found the elements of the offense were established beyond a reasonable doubt. The presence of A1C AL's DNA mixed with Appellant's semen on his bed sheet, coinciding with Appellant's admissions to his friend and to A1C AL that he had sexual intercourse with A1C AL, is sufficient to establish Appellant committed a sexual act upon A1C AL by penetrating her vulva with his penis.

Regarding the second element of the offense, we find the evidence, when viewed in the light most favorable to the prosecution, would support a reasonable factfinder's determination that Appellant committed the sexual act when A1C AL was incapable of consenting due to impairment by alcohol consumption and her condition was known or reasonably should have been known to Appellant.

We discussed A1C AL's impairment at length in the discussion above. There was convincing evidence that A1C AL was in fact incapable of consent due to intoxication by alcohol. She testified about the numerous alcoholic beverages she drank that night at the bar, that she only had intermittent recall of events, and that one of her last memories of the evening was walking up the stairs before waking up on the couch the next morning. While most witnesses described her as sleeping, one described her as completely passed out. Regardless of the characterization, the testimony is clear that her faculties were so impaired that even after other party-goers threw "a lot" of ping pong balls at her "a multiple number of times," hitting her in the face and body, she only briefly became

responsive. She had no recollection of falling asleep on the couch, of Appellant taking her to his bedroom, or of the sexual act.

Because Appellant was not at the bar with A1C AL and their group of friends, it would not be reasonable to infer that Appellant knew of the total number of drinks she consumed or knew of her intoxicated condition prior to her arrival at his house. However, the evidence showed there were clear, outward signs of A1C AL's intoxication after the group left the bar and met up with Appellant at his house. A1C AL and several eyewitnesses testified as to A1C AL's obvious intoxication at Appellant's house. Their friends observed A1C AL stumbling and slurring her words. Her body movements and eyes indicated she was in a drunken state, and she was not even aware of the presence of Ms. DM for some period of time, even though they were in the same room together. In plain view of everyone at the party, A1C AL went to a couch in the living room and fell asleep due to drunkenness. She remained passed out on the couch even as the party continued on around her. Based on evidence that the partygoers were located within view of each other in the open living room and kitchen area, it is reasonable to infer Appellant observed A1C AL's intoxicated condition, even if he was not specifically aware of the numerous alcoholic beverages she had consumed at the bar.

In fact, in Appellant's own admissions, A1C AL was hanging off the couch in her sleep when he told her to go sleep in his room. Then he had to correct her course, because she walked in the wrong direction, and he guided her down the steep stairway to his bedroom. Last, evidence that Appellant knew of A1C AL's impaired condition was written in his text message, when he wrote "[w]e were both really drunk." While his own state of intoxication may have led Appellant to confuse A1C AL's intoxication for mere sleepiness, his awareness of her intoxication is judged by an objective standard. An ordinary, reasonable, prudent, and sober person, having observed her physical signs of intoxication while awake and her lack of reaction to the ping pong balls while on the couch, would have recognized her level of intoxication. The qualifier "really," used by Appellant to describe A1C AL's level of intoxication, along with the other witnesses' testimony on A1C AL's apparently high level of intoxication, is sufficient to show that he knew or should have known of A1C AL's condition.

After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court

ACM 38612